UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

APR 1 6 2015

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. **15 CR 204** |
| | : | |
| | : | (UNDER SEAL) |
| | : | |
| | : | VIOLATIONS: |
| | : | |
| v. | : | 50 U.S.C. § 1705 |
| | : | (Conspiracy to Violate the International |
| BAHRAM MECHANIC, | : | Emergency Economic Powers Act) |
| KHOSROW AFGHAHI, | : | |
| TOORAJ FARIDI, | : | 50 U.S.C. § 1705 |
| FARATEL CO., | : | (Violation of the International Emergency |
| SMART POWER SYSTEMS INC., | : | Economic Powers Act) |
| ARTHUR SHYU, | : | |
| HOSODA TAIWAN CO. LTD., | : | 18 U.S.C. § 1956(h) |
| MATIN SADEGHI, AND | : | (Conspiracy to Commit Money |
| GOLSAD ISTANBUL TRADING LTD. | : | Laundering) |
| | : | |
| | : | 18 U.S.C. § 1956 |
| Defendants. | : | (Money Laundering) |
| | : | |
| | : | 31 U.S.C. §§ 5314 and 5322 |
| | : | (Willful Failure to File Foreign Bank and |
| | : | Financial Accounts) |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting) |

*Sealed*
Public and unofficial staff access
to this instrument are
prohibited by court order.

## INDICTMENT

The Grand Jury Charges:

## COUNT ONE
**(Conspiracy to Violate the International Emergency Economic Powers Act)**
**[50 U.S.C. § 1705]**

## INTRODUCTION

### The International Emergency Economic Powers Act

1.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, gives the President of the United States broad authority to regulate exports and other international transactions in times of national emergency.  IEEPA controls are triggered by an Executive Order declaring a national emergency based on an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain practices and transactions with respect to various sanctioned nations by U.S. persons or involving U.S.-origin goods.

2.      Pursuant to IEEPA, 50 U.S.C. § 1705, it is a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

### The Iranian Transactions Regulations

3.      On March 15, 1995, the President issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and ... declare[d] a national emergency to deal with that threat."

4.      On May 6, 1995, the President issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and to impose comprehensive trade and financial sanctions on Iran.  These sanctions prohibited, among other

things, the exportation or reexportation to Iran or the Government of Iran of any goods, technology, or services from the United States.

5.      On August 17, 1997, the President issued Executive Order 13059 consolidating and expanding upon Executive Orders 12957 and 12959 (collectively, "Executive Orders"). In addition to the prohibitions contained in Executive Orders 12957 and 12959, Executive Order 13059 prohibited the exportation, reexportation, sale, or supply, directly or indirectly of any goods, technology, or services from the United States, or by a United States person, to Iran or the Government of Iran. This prohibition included the exportation, reexportation, sale, or supply of goods, technology, or services to a person in a third country with knowledge or reason to know that such goods, technology, or services were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran. The Executive Orders authorized the U.S. Department of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury, Office of Foreign Assets Control ("OFAC") issued the Iranian Transactions Regulations ("ITR"), later renamed the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560.[1]

6.      The ITR imposed, among others, the following prohibitions:

**Section 560.201 – Prohibited importation of goods or services from Iran.**
Except as otherwise authorized …, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran …, is prohibited.

---

[1] On October 22, 2012, the Department of the Treasury's OFAC changed the heading of the "Iranian Transactions Regulations" to the "Iranian Transactions and Sanctions Regulations," amended the renamed ITSR, and reissued them in their entirety. The prohibited activities set forth herein were in effect under the ITR and remain in full force and effect under the ITSR.

**Section 560.203 – Evasions; attempts.**

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is prohibited.

**Section 560.204 – Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.**

Except as otherwise authorized …, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

**Section 560.205 – Prohibited reexportation of goods, technology, or services to Iran or the Government of Iran by persons other than United States persons; exceptions.**

(a) Except as otherwise authorized … the reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods technology, or services that have been exported from the United States is prohibited if:

(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

(2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license applications requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part ….

4

**Section 560.206 – Prohibited trade-related transactions with Iran; goods, technology, or services.**

> (a) Except as otherwise authorized … no United States person, wherever located, may engage in any transaction or dealing in or related to:

> (1) Goods or services of Iranian origin or owned by the Government of Iran; or

> (2) Goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran.

**Section 560.207 Prohibited investment**

> Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, any new investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran is prohibited.

**Section 560.208 – Prohibited facilitation by United States persons of transactions by foreign persons.**

> Except as otherwise authorized … no United States person, wherever located may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

7.     "United States person" includes United States citizens, permanent resident aliens, any persons in the United States, as well as companies and other entities organized under United States law, including their foreign branches, and entities incorporated outside the United States that are ultimately owned or controlled by United States persons.

The Export Administration Regulations

8.     On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, implementing the Export Administration Regulations ("EAR") by declaring a

5

national emergency with respect to the unrestricted access of foreign parties to United States goods and technologies. The President has issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by the Executive Order through the present.[2]

9.    Among other things, the EAR restricts the export of certain goods and technologies unless authorized by the Department of Commerce through the issuance of a valid export license by its Bureau of Industry and Security ("BIS"). Certain goods and technologies that had commercial applications but also could make a significant contribution to the military or nuclear potential of other nations and could be detrimental to the foreign policy or national security of the United States were commonly referred to as "dual-use" items.

10.    The Commerce Control List, which is contained in the EAR at 15 C.F.R. Part 774, Supplement 1, categorized dual-use items controlled for export by the Department of Commerce. Items on the Commerce Control List were identified by an Export Control Classification Number ("ECCN") that set forth a description of the controlled commodity or technology, its licensing requirements, any potential license exceptions, and the reasons for its export control.

11.    ECCN 3A991 includes certain electronic devices and components. A license from BIS is required to export items under this ECCN to certain countries for anti-terrorism reasons.

---

[2] Prior to August 21, 2001, the Department of Commerce drew its authority to investigate export violations from the Export Administration Act ("EAA"). The EAA authorized the Secretary of Commerce to prohibit or curtail the export of any goods, technology, or software items, as necessary to protect the national security, foreign policy, nonproliferation, and short-supply interests of the United States. The Secretary of Commerce implemented the authority provided by the EAA by issuing the EAR, 15 C.F.R. Parts 730-774. The EAA lapsed on August 21, 2001.

12.     Under the EAR, a license is required for anti-terrorism purposes to export or reexport to Iran any item identified by a particular ECCN for which anti-terrorism controls apply, including ECCN 3A991.

13.     Bank Mellat is an Iranian bank that the U.S. Department of the Treasury has placed on a watchlist of banks which may be trading in violation of United Nations Security Council Resolutions.

The Defendants

14.     The defendant BAHRAM MECHANIC, aka "BAHRAM MECHANIC ESFAHANI," a United States person, was the majority owner and Chairman of the Board of FARATEL CO. ("FARATEL"), located in Iran and the majority owner of its sister company, SMART POWER SYSTEMS INC. ("SPS"), located in Houston, Texas.

15.     The defendant FARATEL was an Iranian corporation with its principal place of business in Tehran, Iran.  FARATEL was engaged in the procurement of microelectronics and the design of uninterruptible power supplies (UPS) for use by various entities in Iran, as indicated by FARATEL's customer list.  This customer list included both commercial entities and Iranian Government agencies such as the, the Iranian Ministry of Defense, the Atomic Energy Organization of Iran and the Iranian Centrifuge Technology Company (TESA).

16.     The defendant SPS was a privately held corporation with its principal place of business in Houston, Texas.  SPS was engaged in the design and manufacture of UPS in cooperation with FARATEL.

17.     The defendant KHOSROW AFGHAHI, a United States person, was the Managing Director and part owner of FARATEL, and the minority owner of its sister company SPS.

7

18.     The defendant TOORAJ FARIDI, a United States person, also known as "Roger", was a Vice President of SPS of Operations and an engineer at FARATEL.

19.     The defendant ARTHUR SHYU, also known as "SHU CHIEN-CHUNG", was the Senior Manager of HOSODA TAIWAN CO. LTD. ("HOSODA"), a trading company located in Taipei, Taiwan.

20.     The defendant MATIN SADEGHI operated GOLSAD ISTANBUL TRADING LTD. ("GOLSAD"), a shipping company located in Istanbul, Turkey.

THE CONSPIRACY

21.     Beginning on or about January 2010, the exact date unknown, and continuing through the time of this Indictment, within the Southern District of Texas and elsewhere,

> BAHRAM MECHANIC
> KHOSROW AFGHAHI
> TOORAJ FARIDI
> FARATEL CO.
> SMART POWER SYSTEMS INC.
> ARTHUR SHYU
> HOSODA TAIWAN CO. LTD.
> MATIN SADEGHI
> GOLSAD ISTANBUL TRADING LTD.

defendants herein, and others known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with each other to commit offenses against the United States, to wit, to willfully violate IEEPA, the ITR (and ITSR), and the EAR in violation of Title 50, United States Code Section 1705, and Title 31, Code of Federal Regulations, Part 560, and Title 15, Code of Federal Regulations Parts 730-774.

22.     At all times relevant to the indictment, MECHANIC, as a principal of FARATEL and SPS, organized and led a procurement network consisting of the defendants listed, as well as

8

others known and unknown to the grand jury, for the purpose of acquiring sensitive items and other goods on behalf of entities in Iran.

23.     Between 1985 and 2012, MECHANIC's illegal trade activities were investigated by United States Government agencies on at least three separate occasions, resulting in both one criminal conviction and one civil action.  Two of the three investigations focused on MECHANIC's activities for Iran.  Throughout the course of these investigations and related proceedings, MECHANIC was repeatedly apprised by the United States Government of the existence ITR and other laws prohibiting transactions by United States persons with, or on behalf of, Iran.  However, instead of heeding that notice, MECHANIC utilized this knowledge of the restrictions to devise a sophisticated trans-national network of individuals and companies to mask their activities, evade the restrictions and continue to expand his illegal transactions with Iran.

<u>The Electronics Shipped by Defendants</u>

24.     Between on or about July 1, 2010 and up to the present, the defendants developed and executed a scheme to obtain various commodities, including dual-use United States-origin microelectronics, and illegally export these to Iran.  During this time, the defendants obtained at least approximately 28 million parts valued at approximately $24 million from companies worldwide and shipped these commodities to Iran via third countries such as Taiwan and Turkey.  FARATEL received at least 250 shipments in Iran during the relevant time period.  The shipments consisted of microelectronics such as microcontrollers ("MCUs") and digital signal processors ("DSPs") as well as other equipment related to Uninterruptable Power Supply (UPS) technology.

9

25.     A UPS is an electrical apparatus that provides emergency power when normal electrical power fails and, for that reason, UPSs are critical for various military systems such as naval vessels, radar arrays and air defense systems and are also crucial in the nuclear energy sector.  An UPS is superior to an auxiliary generator in that it will provide near-instantaneous protection from power interruptions, by supplying energy stored in batteries.

26.     An MCU is a small computer on an integrated circuit that contains a processor, memory, and inputs and outputs to a larger system.  MCUs are widely utilized in military systems to run a pre-set sequence of actions, such as running a missile through launch and targeting.  Specific attributes such as low-power consumption and high-speed processing make certain classes of MCUs well suited for weapons.

27.     DSPs are a specialized type of microprocessor designed to optimize digital signal processing.  They are used to continuously perform complex mathematical functions on data, such as modulating an audio stream to reduce noise.  Advanced DSPs are capable of performing these calculations in near real-time.  Modern foreign weapon systems, such as surface-to-air missiles and cruise missiles, employ digital avionics suites to carry out their guidance profiles.  DSP chips are at the heart of the avionics computational center onboard modern missile systems.

28.     Atmel product AT89C55WD-24PU is a high performance MCU classified under ECCN 3A991.a and a license was required from OFAC or BIS before it could be exported or re-exported to Iran.

29.     Texas Instruments products TMS320F28069PZT and TMS320F28235PGFA are high performance MCUs classified ECCN 3A991.a and a license was required from OFAC or BIS before they could be exported or reexported to Iran.

10

30.     The above-described commodities were illegally transferred to FARATEL in Iran via HOSODA or GOLSAD and were then utilized by FARATEL to build and supply UPSs for various Iranian entities.  MECHANIC, in particular, significantly profited from his illegal conduct, claiming personal assets in the United States of over $8.5 million in 2014 as well as at least $12.5 million in personal Iranian assets in addition to the ownership of Faratel which was valued at approximately $18 million as of 2013.

31.     Other known members of the conspiracy included, among others, the following individuals:

        a. an Iranian national who was employed as a designing manager at FARATEL ("Faratel Employee A") and

        b. an Iranian national who was employed as purchasing manager at FARATEL ("Faratel Employee B").

### OBJECTS OF THE CONSPIRACY

32.     The objects of the conspiracy were:

        a. to export and reexport goods, technology, and services to the country of Iran;

        b. to approve, finance, facilitate, and guarantee prohibited transactions to Iran by foreign persons;

        c. to evade and avoid and attempt to evade and avoid the prohibitions and licensing requirements of IEEPA, the ITR, and EAR;

        d. to conceal the prohibited activities and transactions from detection by the United States government so as to avoid penalties and disruption of the illegal activity;

        e. to profit and enrich themselves through these illegal activities; and

f. to make prohibited investments in Iran.

## MANNER AND MEANS OF THE CONSPIRACY

33.     At all times relevant to the indictment, defendants executed their scheme in the following manner.  MECHANIC regularly received lists of goods sought by FARATEL which at times included sensitive U.S. origin goods.  MECHANIC would approve these orders and direct SHYU to fulfill them.  SHYU would then acquire these commodities, including U.S. origin items, from sources worldwide using his company HOSODA, and then ship the commodities directly to Iran or through Turkey, where defendant SADEGHI would act as a "cut out" or false buyer via his company GOLSAD.  SADEGHI would receive the shipments from SHYU and then send them to FARATEL in Iran.  MECHANIC maintained control over the transactions, requiring that his co-conspirators notify him and obtain his approval for each stage of the subterfuge transactions completed by the network.

34.     At all times relevant to the indictment, FARIDI and AFGHAHI assisted MECHANIC by processing orders from FARATEL, organizing the network, and unlawfully procuring and shipping the controlled items to FARATEL.  FARIDI also, at times, exported controlled items directly from the company SPS in the United States to FARATEL in Iran via SHYU in Taiwan.

35.     At all times relevant to the indictment, the defendants also utilized a variety of intricate illicit techniques to send funds from Iran in payment for the items illegally procured by the network.  One such technique was for FARATEL to initiate payment to GOLSAD in Turkey.  SADEGHI and GOLSAD would receive these funds and then send them to SHYU and his company HOSODA as payment for the commodities sent to FARATEL.  The Iranian currency

utilized by FARATEL was converted into various other currencies including Turkish Lira, Japanese Yen, United States Dollars ("USD") and Euros so that it could be sent to Taiwan without unduly alerting authorities. FARATEL and coconspirators then employed various other foreign companies to cause bank wire transfers of these illicit funds to Singapore in order to ultimately transfer funds to MECHANIC in the Southern District of Texas and elsewhere.

36.     At all times relevant to the indictment, in addition to the procurement of controlled electronics themselves, MECHANIC and FARIDI also provided design services to assist FARATEL employees with manufacturing new equipment for Iranian customers. MECHANIC supervised the design and transfer of new equipment to Iranian entities.

37.     At no time did the defendants, individually or through any of their companies, ever apply for or acquire a license or other permission from OFAC or BIS to export or reexport any item listed in this Indictment to Iran.

<u>OVERT ACTS</u>

38.     In furtherance of this conspiracy and to effect its objects, the defendants, together and with others, committed and caused to be committed within the Southern District of Texas and elsewhere, the following:

a.     On or about June 13, 2011, SHYU sent an email to MECHANIC from a personal email account and instructed him never to copy HOSODA's business email. SHYU explained that the controlled transistor previously requested by MECHANIC could not be shipped to Iran from Taiwan without an export license.  SHYU explained that the transistor could be shipped to other countries without a license, unlike to its true destination, Iran, and instead instructed MECHANIC to find a cut out company in a different country that could

receive the transistor and forward it to Iran.  SHYU then outlined the following circuitous, illicit

steps to take for completing an order, designed to evade United States law:

1. The quotes and official order should come from the third company to HOSODA and SHYU would pretend that the entire deal was with the third company.

2. The payment should come from the third company and all correspondence should be between the third company and HOSODA.  Anything that mentioned FARATEL should only go to SHYU's personal email.

3. Once the third company received the transistors, they should not be immediately sent to FARATEL.  "The better way is to mix up other parts for shipment or make separate dispatch and also wait for some time..."

   b.  On or about November 26, 2011, SHYU sent an e-mail to MECHANIC in

which SHYU stated that an invoice would be ready to ship in a week and asked whether it should

be shipped to SADEGHI.  MECHANIC confirmed that the invoice should be made in the name

of GOLSAD.  MECHANIC then instructed SADEGHI to send the order to HOSODA.  SHYU

reminded MECHANIC that the order should not be sent to his official HOSODA e-mail, either

from MECHANIC or SADEGHI, and should not mention FARATEL in Iran.  SHYU also

explained that he added "false" resistors and diodes that were not originally ordered to show that

GOLSAD is not just interested in the export-controlled transistors.  MECHANIC forwarded the

e-mail to SADEGHI and explained that the resistors and diodes were added to "pretend that you

don't buy only transistor."  MECHANIC enclosed a false invoice listing GOLSAD as the

purchaser and adding other parts the way SHYU had instructed.

   c.  On or about November 27, 2011 SADEGHI emailed a GOLSAD employee

and asked him to convert large sums of Turkish Lira to USD, to deduct money from

FARATEL's account, and to zero out a specific invoice and provide the available balance in

USD so FARATEL could place another order.  In an earlier e-mail in the same exchange,

14

SADEGHI was informed by the same GOLSAD employee that money was transferred from FARATEL to GOLSAD.  SADEGHI forwarded the entire exchange to MECHANIC on November 28, 2011 for his approval.

     d.  On or about July 17, 2012, SHYU and MECHANIC exchanged emails with Faratel Employee B, located in Iran, about a FARATEL invoice.  Faratel Employee B then transferred money for an invoice via Bank Mellat, however SHYU replied that he did not think transferring money directly from Bank Mellat was workable "since there is no bank here to accept transaction from Iran now," displaying SHYU's knowledge of certain United States restrictions on his activities. On July 18, 2012, SHYU e-mailed MECHANIC and Faratel Employee B stating that "we received the payment and put it into your Euro account." MECHANIC replied and asked how much money SHYU had put into "the EURO account" and to send a copy of the invoice.

     e.  On or about February 18, 2013, Faratel Employee B forwarded MECHANIC an e-mail chain between the employee and SHYU discussing which Taiwanese bank they should use to funnel money for the illegal Iranian transactions.  In the email SHYU emphasized the need to conceal the origin of funds and stated "most important – any intermediate bank or our above said bank must not able to find out the original sending bank is in Iran, otherwise it will be returned."

     f.  On or about March 11, 2013, MECHANIC received a document from FARATEL with certain bank information and handwritten Farsi notes. The information included defendant MECHANIC's Bank of America account ending in 6538 and gave money wire instructions for domestic and international wires.  The handwritten notes requested a transfer of

funds to MECHANIC in the amount of $100,000 USD.  Additionally, the communication indicated that the equivalent amount of 3,610,000,000 Iranian Rials ("IRR") would be deposited into this account that same day.  MECHANIC's financial records confirmed that on March 15, 2013 he received approximately $99,911 USD from Hong Kong.

      g.  On or about March 15, 2013, SHYU and MECHANIC exchanged several e-mails detailing the need to avoid drawing the attention of government customs agents on their illegal activities.  SHYU explained that in order to mask the illegal nature of the export of the export-controlled electronics, he had changed the names of some of the parts and removed the "MIL-STD" (Military-Standard) from the name of one of the diodes.  To complete the sham, SHYU recommended that SADEGHI should make corresponding changes on the GOLSAD invoice, and MECHANIC agreed.  SHYU then described how he had edited an invoice to avoid alarm from government customs agents by obscuring the shipping of products to Iran.

      h.  On or about April 24, 2013, MECHANIC received an e-mail containing a handwritten letter from AFGHAHI. The letter asked MECHANIC to telephone AFGHAHI in Tehran about "batteries" purchased through HOSODA for the Police and a possible money transfer from Singapore.

      i.  On or about July 17, 2014, MECHANIC received an e-mail containing a detailed financial breakdown of the UPS and services that had been provided by FARATEL to the Iranian National Police. The chart had a suggested price of 16.3B IRR ($620,649 USD) which was after a 25.42% government discount. The price estimate had a hand-written note and was signed by AFGHAHI.

j.  On or about August 19, 2014, MECHANIC received an email from FARATEL with an enclosed letter addressed from MECHANIC to the "Management of Samen Financial Institution" (Samen) in Tehran, Iran.  The letter stated that the management and shareholders of FARATEL had deposited approximately 230 billion IRR ($9.2 million USD) in their accounts with Samen.  MECHANIC confirmed that his personal account carried a balance of over 80 billion IRR ($3.2 million USD) and further stated that he needed an additional 100 billion IRR ($4 million USD) to invest in a new industrial project and would like to borrow 40 billion IRR ($1.6 million USD), because he had established himself as a creditworthy bank customer.

k.  On or about September 24, 2014, Faratel Employee A, located in Iran, asked FARIDI to send twenty "rod core" pieces to Iran from SPS.  FARIDI directed a United States person and SPS employee to "prepare the following samples that we can ship it to Taiwan." On or about October 2, 2014, SHYU confirmed that he completed the illegal transshipment cycle, by sending the "samples" that FARIDI had requested.  Along with the email, SHYU furnished documentation showing that SHYU shipped the requested items to FARATEL in Iran.  On or about October 12, 2014, Faratel Employee A confirmed for FARIDI that the rod cores had been received in Iran.

l.  In a telephonic conversation on or about December 28, 2014, between AFGHAHI and MECHANIC, AFGHAHI discussed money transfers to HOSODA.  AFGHAHI stated that recently it had become difficult to process fund transfers without drawing the attention of authorities.  AFGHAHI stated that it is easier to do money transfers internally for funds that are below $5,000 USD, since this amount will not get reported by banks.  AFGHAHI and

MECHANIC then discussed exchange rates. MECHANIC stated that the one who "sends from America is good," so long as it won't take too long, and suggests that the conspirators should arrange to send small weekly amounts under $10,000 over one month periods.

m. On or about January 17, 2015, in a telephonic conversation between AFGHAHI and MECHANIC, MECHANIC explained that shipping a recent Uninterruptable Power Supply order was a big problem because the company was American. MECHANIC stated that the difficulty arose because it was "inappropriate in this side," acknowledging the illegality of the shipments from the United States. MECHANIC further stated that because Iran requires labels on pallets to read care/of "Bandar Abbas" and "Persian Gulf," these labels couldn't be on the pallets shipped directly from the United States or containing U.S.-origin parts, for obvious reasons. AFGHAHI confirmed that this labeling was a requirement of Iran's customs. MECHANIC added that he talked with SHYU three times, for approximately six hours, in order to figure out what to do with the papers and equipment in order to continue unabated in their scheme. It was decided amongst the conspirators that to create an additional layer of subterfuge, the FARATEL logo would be changed to FA. MECHANIC then indicated that he had decided to reduce SHYU's commission from 5% to 2.5% because MECHANIC had done most of the work on the illegal transaction.

n. On or about February 26, 2015, MECHANIC sent an email to an individual located in Iran and informed the individual that "these PIs are only for you and Mr. AFGHAHI. Attached is PI for registration also real price." In addition, MECHANIC attached two spreadsheet invoices to the email. One spreadsheet titled "150209 PI-3020-A-R2 for SPS 220V Order (REAL).xls, was an invoice with the seller listed as HOSODA and the consignee as

18

FARATEL, the invoice also stated "REF. SPS 220V Sample Order." The invoice contained

numerous (thirty four) items, UPS units with SPS firmware upgrades, and battery cabinets which

totaled approximately 52,000 USD. The second spreadsheet, titled "150209 PI-3020R2 for SPS

220V Order (CUSTOM).xls, was an invoice with the seller listed as HOSODA and the consignee

as FARATEL, the invoice also stated "REF. SPS 220V Sample Order." The invoice contained

the same thirty four commodities, UPS units with SPS firmware upgrades, and battery cabinets,

but with different prices which instead totaled approximately 25,000 USD.

**COUNTS TWO THROUGH SEVEN**
**(IEEPA)**
**[50 U.S.C. § 1705]**

39.     On or about the dates listed below, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court, the defendants named below, aided and

abetted by each other and others, did unlawfully, knowingly, and willfully reexport, or cause the

reexport, of United States-origin items to Iran, to wit microelectronics, without having obtained

the required licenses from OFAC or BIS in violation of Title 50, United States Code, Section

1705; Title 31, Code of Federal Regulations, Parts 560.203, 560.204, 560.205, and 560.208; Title

15, Code of Federal Regulations, Part 764.2; and Title 18, United States Code, Section 2.

| Count | Date | Defendants | Part Number/Export Classification | Quantity |
|-------|------|-----------|-----------------------------------|----------|
| 2 | 4/19/2012 | BAHRAM MECHANIC, ARTHUR SHYU, MATIN SADEGHI, FARATEL CO., HOSODA TAIWAN CO. LTD., GOLSAD ISTANBUL TRADING LTD. | AT89C55WD-24PU ECCN 3A991.a | 4,000 |
| 3 | 6/9/2012 | BAHRAM MECHANIC, ARTHUR SHYU, MATIN SADEGHI, | AT89C55WD-24PU ECCN 3A991.a | 1,000 |

| | | | | |
|---|---|---|---|---|
| | | FARATEL CO., HOSODA TAIWAN CO. LTD., GOLSAD ISTANBUL TRADING LTD. | | |
| 4 | 10/1/2012 | BAHRAM MECHANIC, ARTHUR SHYU, MATIN SADEGHI, FARATEL CO., HOSODA TAIWAN CO. LTD., GOLSAD ISTANBUL TRADING LTD. | AT89C55WD-24PU ECCN 3A991.a | 3,200 |
| 5 | 11/14/2012 | BAHRAM MECHANIC, ARTHUR SHYU, MATIN SADEGHI, FARATEL CO., HOSODA TAIWAN CO. LTD., GOLSAD ISTANBUL TRADING LTD. | AT89C55WD-24PU ECCN 3A991.a | 1,000 |
| 6 | 9/30/2013 | BAHRAM MECHANIC, ARTHUR SHYU, FARATEL CO., HOSODA TAIWAN CO. LTD., GOLSAD ISTANBUL TRADING LTD. | TMS320F28069PZT ECCN 3A991.a | 10 |
| 7 | 3/13/2012 | BAHRAM MECHANIC, ARTHUR SHYU, MATIN SADEGHI, FARATEL CO., HOSODA TAIWAN CO. LTD. GOLSAD ISTANBUL TRADING LTD. | TMS320F28235PGFA ECCN 3A991.a | 10 |

## COUNT EIGHT
### (IEEPA)
### [50 U.S.C. § 1705]

40.     On or about August 16, 2011, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

20

defendant herein, aided and abetted by others did unlawfully, knowingly, and willfully export, reexport, or cause the export or reexport of, goods, to wit: 3,000 pieces of digital signal processor TMS320LF2406PZS to Iran without first having obtained the required license from OFAC, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.203, 560.204, 560.208; and Title 18, United States Code, Section 2.

### COUNT NINE
### (IEEPA)
### [50 U.S.C. § 1705]

41.     On or about July 26, 2014, within the Southern District of Texas, and elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others did unlawfully, knowingly, and willfully export, reexport, or cause the export or reexport of, goods, to wit: 180 pieces of microcontroller STM32F405VGT7TR to Iran without first having obtained the required license from OFAC, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.203, 560.204, 560.208; and Title 18, United States Code, Section 2.

### COUNT TEN
### (IEEPA)
### [50 U.S.C. § 1705]

42.     On or about January 29, 2014, within the Southern District of Texas, and elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,
ARTHUR SHYU,
SMART POWER SYSTEMS,
HOSODA TAIWAN CO. LTD.,
FARATEL CO.

defendants herein, aided and abetted by each other and others did unlawfully, knowingly, and

willfully export, and cause the export of, goods, to wit: 250 pieces of Transformer

TBF15/85003800, 70 pieces of Transformer TBF20/85004500, 250 pieces of TBF15/Toroid and

70 pieces of TBF20/Toroid from the United States to Iran without first having obtained the required

license from OFAC, in violation of Title 50, United States Code, Section 1705; Title 31, Code of

Federal Regulations, Parts 560.203, 560.204, and 560.208; and Title 18, United States Code,

Section 2.

**COUNT ELEVEN**
**(IEEPA)**
**[50 U.S.C. § 1705]**

43.     On or about September 4, 2014, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court,

> BAHRAM MECHANIC,
> TOORAJ FARIDI,
> ARTHUR SHYU,
> SMART POWER SYSTEMS,
> HOSODA TAIWAN CO. LTD.,
> FARATEL CO.

defendants herein, aided and abetted by each other and others, did unlawfully, knowingly, and

willfully export, and cause the export of, goods, to wit: 10 pieces of Ferrite rod core 10X40mm,

10 pieces of Rod Coil 11AWG/10T, 5 pieces of Rod Coil 12AWG/10T, and 5 pieces of Rod Coil

14AWG/10T from the United States to Iran without first having obtained the required license from

OFAC, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal

Regulations, Parts 560.203, 560.204, and 560.208; and Title 18, United States Code, Section 2.

## COUNT TWELVE
### (IEEPA)
### [50 U.S.C. § 1705]

44.     On or about March 30, 2015, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court,

> TOORAJ FARIDI,
> ARTHUR SHYU,
> SMART POWER SYSTEMS,
> HOSODA TAIWAN CO. LTD.,
> FARATEL CO.

defendants herein, aided and abetted by each other and others, did unlawfully, knowingly, and

willfully import, and cause the import of, goods, to wit: WatchGuard components from Iran to the

United States via HOSODA, without first having obtained the required license from OFAC, in

violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations,

Parts 560.201 and 560.208; and Title 18, United States Code, Section 2.

## COUNT THIRTEEN
### (IEEPA)
### [50 U.S.C. § 1705]

45.     From on or about January 2010 through the present, within the Southern District

of Texas, and elsewhere, and within the jurisdiction of the Court,

> BAHRAM MECHANIC
> KHOSROW AFGHAHI

defendants herein, aided and abetted by each other and others, did unlawfully, knowingly, and

willfully make and attempt to make financial investments in Iran without first having obtained the

required license from OFAC, in violation of Title 50, United States Code, Section 1705; Title 31,

Code of Federal Regulations, Parts 560.203 and 560.207; and Title 18, United States Code,

Section 2.

23

## COUNT FOURTEEN
## (MONEY LAUNDERING CONSPIRACY)
### [18 U.S.C. §§ 1956(H) AND 1956(a)(2)(A) and (B)(1)]

46.     The Introduction, the Manner and Means, and the Overt Acts to Count one of this Indictment are hereby incorporated by reference as if fully set forth.

47.     Beginning on or about July 1, 2010, the exact date unknown, and continuing at least through February of 2014, within the Southern District of Texas and elsewhere,

> BAHRAM MECHANIC
> KHOSROW AFGHAHI
> ARTHUR SHYU

the defendants herein, illegally, knowingly, and unlawfully, combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury to commit offenses against the United States, that is, the defendants conspired to transport, transmit, and transfer a monetary instrument to a place in the United States from or through a place outside the United States with the intent to conceal and disguise the nature, location, source, ownership, and control of the proceeds and to promote the carrying on of specified unlawful activity, to wit:  willfully exporting goods from the United States, and willfully causing the reexport of United States-origin goods, to Iran without a license from OFAC or BIS in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code of Federal Regulations, Parts 730-774.

48.     All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FIFTEEN
### (Money Laundering—18 U.S.C. §§ 1956(a)(2)(A) and (B)(1))

49.     On or about March 11, 2013, within the Southern District of Texas, and elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit, and transfer a monetary instrument to a place in the United States from or through a place outside the United States with the intent to conceal and disguise the nature, location, source, ownership, and control of the proceeds and to promote the carrying on of specified unlawful activity, to wit:  willfully exporting goods from the United States, and willfully causing the reexport of United States-origin goods, to Iran without a license in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT SIXTEEN
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

50.     On or about January 21, 2013, within the Southern District of Texas, and elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit, and transfer a monetary instrument to a place in the United States from or through a place outside the United States with the intent to conceal and disguise the nature, location, source, ownership, and control of the proceeds and to promote the carrying on of specified unlawful

25

activity, to wit: willfully exporting goods from the United States, and willfully causing the

reexport of United States-origin goods, to Iran without a license in violation of Title 50, United

States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code

of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT SEVENTEEN
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

51.     On or about February 25, 2013, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit,

and transfer a monetary instrument to a place in the United States from or through a place

outside the United States with the intent to conceal and disguise the nature, location, source,

ownership, and control of the proceeds and to promote the carrying on of specified unlawful

activity, to wit: willfully exporting goods from the United States, and willfully causing the

reexport of United States-origin goods, to Iran without a license in violation of Title 50, United

States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code

of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT EIGHTEEN
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

52.     On or about September 18, 2013, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit,

and transfer a monetary instrument to a place in the United States from or through a place

outside the United States with the intent to conceal and disguise the nature, location, source,

ownership, and control of the proceeds and to promote the carrying on of specified unlawful

activity, to wit:  willfully exporting goods from the United States, and willfully causing the

reexport of United States-origin goods, to Iran without a license in violation of Title 50, United

States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code

of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT NINETEEN
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

53.    On or about November 20, 2013, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit,

and transfer a monetary instrument to a place in the United States from or through a place

outside the United States with the intent to conceal and disguise the nature, location, source,

ownership, and control of the proceeds and to promote the carrying on of specified unlawful

activity, to wit:  willfully exporting goods from the United States, and willfully causing the

reexport of United States-origin goods, to Iran without a license in violation of Title 50, United

States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code

of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT TWENTY
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

54.     On or about December 5, 2013, within the Southern District of Texas, and elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit, and transfer a monetary instrument to a place in the United States from or through a place outside the United States with the intent to conceal and disguise the nature, location, source, ownership, and control of the proceeds and to promote the carrying on of specified unlawful activity, to wit:  willfully exporting goods from the United States, and willfully causing the reexport of United States-origin goods, to Iran without a license in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT TWENTY-ONE
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

55.     On or about February 6, 2014, within the Southern District of Texas, and elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit, and transfer a monetary instrument to a place in the United States from or through a place outside the United States with the intent to conceal and disguise the nature, location, source,

ownership, and control of the proceeds and to promote the carrying on of specified unlawful activity, to wit:  willfully exporting goods from the United States, and willfully causing the reexport of United States-origin goods, to Iran without a license in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT TWENTY-TWO
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

56.     On or about August 31, 2013, within the Southern District of Texas, and elsewhere, and within the jurisdiction of the Court,

### BAHRAM MECHANIC,

defendant herein, aided and abetted by others, did unlawfully, and knowingly transport, transmit, and transfer a monetary instrument to a place in the United States from or through a place outside the United States with the intent to conceal and disguise the nature, location, source, ownership, and control of the proceeds and to promote the carrying on of specified unlawful activity, to wit:  willfully exporting goods from the United States, and willfully causing the reexport of United States-origin goods, to Iran without a license in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15, Code of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT TWENTY-THREE
### (Money Laundering – 18 U.S.C. 1956(a)(2)(A) and (B)(1))

57.     On or about August 10, 2010, within the Southern District of Texas, and

elsewhere, and within the jurisdiction of the Court,

KHOSROW AFGHAHI,
ARTHUR SHYU,

defendants herein, aided and abetted by others, did unlawfully, and knowingly transport,

transmit, and transfer a monetary instrument to a place in the United States from or through a

place outside the United States with the intent to conceal and disguise the nature, location,

source, ownership, and control of the proceeds and to promote the carrying on of specified

unlawful activity, to wit:  willfully exporting goods from the United States, and willfully causing

the reexport of United States-origin goods, to Iran without a license in violation of Title 50,

United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; and Title 15,

Code of Federal Regulations, Parts 730-774.

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and (B)(1).

## COUNT TWENTY- FOUR
### (Willful Failure to File FBARs – 31 U.S.C. 5314 and 5322)

58.     Beginning on or about September 1, 2009, the exact date unknown, and

continuing every year through the time of this Indictment, within the Southern District of Texas,

and elsewhere, and within the jurisdiction of the Court,

BAHRAM MECHANIC,

defendant herein, did unlawfully, willfully, and knowingly fail to file with the Commissioner of

the Internal Revenue Service, U. S. Department of the Treasury, an FBAR disclosing that he

had a financial interest in, and signature and other authority over, a bank, securities, and other

30

financial account in a foreign country, to wit, at least two financial accounts located in Iran at the Samen Credit Institution and Bank Mellat, which each had an aggregate value of more than 10,000.00 USD.

All in violation of Title 31, United States Code, Sections 5314 and 5322; and Title 31, Code of Federal Regulations, Sections 1010.350, and 1010.840(b)).

## NOTICE OF FORFEITURE
### 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C)

Pursuant to Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to defendants charged in Counts One through Thirteen of the Indictment, that upon conviction of Conspiracy to Violate the International Emergency Economic Act (Count One) or of the International Emergency Economic Powers Act (Counts Two through Thirteen), in violation of Title 50, United States Code, Section 1705, all property, real or personal, which constitutes or is derived from proceeds traceable to such offense, is subject to forfeiture.

## NOTICE OF FORFEITURE
### 18 U.S.C. § 982(a)(1)

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to defendants charged in Counts Fourteen through Twenty-three of the Indictment, that upon conviction of a Conspiracy to Commit Money Laundering (Count Fourteen) or of Money Laundering (Counts Fifteen through Twenty-three) in violation of Title 18, United States Code, Section 1956, all property, real or personal, involved in such offense or traceable to such property, is subject to forfeiture.

## Money Judgment

Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, for which the defendants may be jointly and severally liable.

## Property Subject to Forfeiture

The property subject to forfeiture includes, but is not limited to, the following property:

At least $1.3 million in United States dollars.

## Substitute Assets

Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of defendants,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), as incorporated by reference in Title 28, United States Code, Section 2461(c) and in Title 18, United States Code, Section 982(b).

A TRUE BILL:

Original Signature on File

Foreperson of the Grand Jury

KENNETH MAGIDSON
United States Attorney

By:    S Mal Me
S. Mark McIntyre
Assistant United States Attorney

Craig Feazel
Assistant United States Attorney

JOHN P. CARLIN
Assistant Attorney General

By:    Casey Arrowood by perm.
Casey Arrowood
Trial Attorney (Counter Espionage Section)

Matthew Walczewski by perm
Matthew Walczewski
Trial Attorney (Counter Espionage Section)

Date:   April 16, 2015

33